UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GEORGE SMITH,

        Plaintiff,

                                            Case Number 06-14007-BC
v.                                           Honorable Thomas L. Ludington

SBC AMERITECH,

        Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CANCELLING HEARING

On October 2, 2006, Plaintiff George Smith filed an amended complaint against his former employer, Defendant SBC Ameritech,[1] alleging race discrimination and retaliatory termination under Title VII of the Civil Rights Act of 1964, as amended; and under the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.* On May 18, 2007, Defendant filed a motion for summary judgment, arguing that it had a legitimate, non-discriminatory reason for terminating Plaintiff's employment based on his tardiness. A genuine issue of material fact remains, however, because Plaintiff counters that he was timely on that given day and because Defendant offers no other basis for his termination beyond its careful adherence to its attendance policy.

The Court has reviewed the parties' submissions and finds that the facts, as deemed relevant by the parties, and the law, as applicable to the arguments that they have chosen to advance, have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid

---

[1] The docket reflects the identity of Defendant as SBC Ameritech, although Plaintiff's amended complaint identifies Defendant as AT&T Teleholdings,Inc., doing business as SBC Ameritech.

in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I.

Plaintiff worked as a customer service representative for Defendant. In his deposition, he maintained that his attendance manager, Michael Bouvrette, would greet him with phrases like "What up, dawg?" and "What up, G?" and would attempt to have Plaintiff give him a "soul brother handshake," despite Plaintiff's requests for Bouvrette to stop. On March 23, 2004, Defendant discharged Plaintiff from his employment. According to Plaintiff, Bouvrette made that decision. On August 4, 2004, Plaintiff filed a complaint with the Michigan Department of Civil Rights (MDCR).

On June 13, 2005, the parties entered into a settlement agreement regarding that complaint, in which Plaintiff waived all claims against Defendant that arose from his employment relationship with Defendant, prior to the effective date of that agreement. More specifically, the agreement provided, in relevant part, as follows:

> [Plaintiff] . . . will immediately withdraw with prejudice any and all grievances, charges, lawsuits, complaints or proceedings of any kind now pending before any court or any state, federal or local agencies or the Union against [Defendant], including but not limited to the [Department of Labor (DOL)] [c]omplaint and the [Equal Employment Opportunity Commission (EEOC)] [c]omplaint. [Plaintiff] agrees to take all action necessary to obtain the aforementioned dismissals . . . . In exchange for the consideration described in this Agreement, [Plaintiff] fully and completely waives, releases and discharges [Defendant] . . . from the claims alleged in the DOL [c]omplaint and EEOC [c]omplaint and any claims, actions, causes of action, damages, attorneys' fees, allegations or demands asserted against [Defendant] and/or any and all claims and damages of any kind that could have been asserted against [Defendant]. [Plaintiff] warrants that there are no corresponding charges or claims of any nature pending in any federal, state, or municipal agency, or any other agency, court or other tribunal, which have not been addressed herein.

> In exchange for the payments and other consideration described in this Agreement, [Plaintiff] also agrees not to sue [Defendant] and forever waives, releases, and discharges [Defendant] from any and all claims, actions, causes of action, obligations for damages . . . , losses, expenses, attorneys' fees or costs, back pay, loss of earnings, debts, reinstatement and any and all other demands which he may have against [Defendant] arising out of [Plaintiff's] employment relationship with [Defendant], and/or any other occurrence whatsoever to the effective date of this Agreement, including, but not limited to:
> (a)  claims raised, or which could have been raised, in the [c]omplaints; and/or claims that have been threatened or alleged by [Plaintiff] against [Defendant]; and/or
> (b)  claims arising under Title VII of the Civil Rights Act of 1964, as amended; . . . the Michigan Civil Rights Act . . . ; and/or
> (c)  claims arising out of any other federal, state or local statute, law, constitution, ordinance, or regulation . . . .

Release Agreement; Dft. Br., Ex. 3, ¶¶ 4, 5 [dkt # 10-5]. Pursuant to that agreement, Plaintiff was reinstated with Defendant on June 22, 2005, along with $5,000 of backpay. *Id.* at ¶¶ 1, 2. Also under that agreement, Plaintiff agreed to treat the time he was away from work (starting on March 23, 2004) until his reinstatement as a one-day suspension for attendance tracking purposes. *Id.* at ¶ 3.

The one-day suspension has its context in Defendant's down-to-the-minute "attendance philosophy." Dft. Br., Ex. 4 [dkt #10-6]. The policy defines a "tardy" as "being 3-59 minutes late at the beginning of an employee's tour or after break or lunch." *Id.* at p. 4. An "incidental absence" includes minutes or hours where an employee is absent during scheduled work time, apart from tardy time. Defendant permits employees three tardies before an employee is counseled, which is followed by corrective action. The policy further provides that, once an employee is on corrective action, any additional tardies may result in moving the employee along in the corrective process. Defendant's corrective process hierarchy is as follows: (1) first written warning; (2) final written warning; (3) unpaid suspension, ranging from one to three days; and (4) possible dismissal, for any

additional tardy beyond the suspension. Finally, the policy provides that employees who do not call in before the start of their shift may face a suspension, and three consecutive days of incidental absence without calling the office will be deemed job abandonment, which results in a voluntary resignation.

Returning to Plaintiff's reinstatement, Bouvrette testified in his deposition that he did not participate in that decision but that the legal department reached that determination. Upon Plaintiff's return, Bouvrette was once again Plaintiff's manager.

In its brief (though without any record citation), Defendant states that Plaintiff had incidental absences on August 26, 2005, October 17, 2005, and November 4, 2005. Dft. Br., p. 7 [dkt #10]. According to Bouvrette's deposition, the absence on November 4, 2005 resulted in a three-day suspension for Plaintiff.

On December 19, 2005, Plaintiff allegedly ran out of gas on the way to work. He narrated, in his deposition, how he left his car on the road at about 9:49 a.m., that he was fortunate to have his wife pick him up within two to three minutes, how they drove 70 m.p.h. in sub-zero temperatures, and how they succeeded in getting him to work by 10:01 a.m., according to the clock in the car (and 10:02 a.m. according to the overhead clock at work). He stated that he "[got] to [his] desk in plenty of time to beat the three minutes and 59 seconds grace [but his] computer wouldn't turn on." Dft. Br., Ex. 2, p. 118 [dkt #10-3]. In his deposition, Plaintiff maintained that he arrived at the office at 10:02:25 a.m.[2] and that he logged in to his computer before 10:02:59 a.m., thus rendering him within the three-minute grace period from the start of his 10 a.m. shift.

---

[2]Defendant has provided a report that gives time and date stamp information for employee card access to the building, which appears to be the source for the 10:02:25 a.m. time. Dft. Br., Ex. 6 [dkt #10-8].

According to Defendant's records, however, Plaintiff logged in at 10:10 a.m. The next day, on December 20, 2005, Paul Prebay, Plaintiff's sales team manager, issued a tardy to Plaintiff. Prebay maintains that he reviewed a report that showed that Plaintiff had a 72.55% rate of adherence (to the attendance policy). Prebay also alleges that he had no knowledge of Plaintiff's purported login difficulties when he issued the tardy. Had Plaintiff raised the issue before the tardy issued, Prebay might have viewed the matter differently, but he did not rescind the tardy based on Plaintiff's later explanation. This tardy resulted in Plaintiff's suspension pending termination. According to Bouvrette, Plaintiff's employment was officially terminated in June 2006. (Bouvrette explained that lapse in time as due to an oversight in sending out the termination letter.)

At one point in his deposition, Plaintiff did testify that Bouvrette continued greeting him with what Plaintiff experienced as racially associated phrases up to the date of his second termination. Pl. Rs. Br., Ex. 1, pp. 155-156 [dkt #15-2]. Plaintiff is African-American, a fact that he notes in his description of his retaliation claim. Pl. Am. Cplt., ¶ 22 [dkt #3].

In his response,[3] Plaintiff makes several other factual assertions, including the following: (1) that, according to Plaintiff's construction of the deposition of Prebay, Defendant's attendance policy did not give notice that failure to log in to a work station by three minutes past shift start would result in a tardy; (2) that a co-worker, Dale Snelenberger, observed Plaintiff struggling to log in on time on December 19, 2005;[4] (3) that Bouvrette never interviewed the co-worker about that situation; and (4) that Bouvrette failed to tell a senior manager who reviewed terminations, Alicia

---

[3] Defendant did not file a reply.

[4] In his deposition, Snelenberger was not certain about the precise time that Plaintiff attempted to log in, although Snelenberger estimated that Plaintiff was present about three to five minutes after the start time of the shift.

Smith, or the associate director of attendance management, Georgine Bauer, about the co-worker's observations. The relevance of these assertions, or the basis in Defendant's procedures and policies for alleging them, is not particularly clear. Nor has Plaintiff provided a factual recitation or legal argument that clarifies those points.

On September 12, 2006, Plaintiff filed his complaint. His amended complaint alleges claims of violations of Title VII of the Civil Rights Act of 1964, as amended (Title VII), and of the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*, as well as retaliation for filing Title VII and ELCRA claims with the MDCR in 2004. On May 8, 2007, Defendant filed the instant motion for summary judgment.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

A.

Regarding Plaintiff's claim under Title VII, 42 U.S.C. § 2000e-2(a)(1) provides:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

A plaintiff may rely on direct or circumstantial evidence to demonstrate a Title VII claim. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

If a plaintiff presents direct evidence of discrimination, then a court need not employ the framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), because the direct evidence eliminates the need for that inferential demonstration of discrimination. *See Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985) (citations omitted). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153 (2000); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006). Failure to prove an essential element of a *prima facie* case need not prove fatal, if a plaintiff can provide sufficient evidence of intentional discrimination. *See Noble v. Brinker International, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004). This burden of persuasion remains with the plaintiff. *Id*.

Without direct evidence, the burden-shifting analysis of *McDonnell-Douglas* will apply. *Johnson*, 215 F.3d at 573. First, a plaintiff must establish a *prima facie* case. Although Plaintiff is not particularly clear on this point, he may be advancing a claim under Title VII based on disparate treatment. Such a claim requires a plaintiff to show that "1) he was a member of a protected class;

2) he was subject to an adverse employment action; 3) he was qualified for the job; and 4) for the same or similar conduct, he was treated differently from similarly situated non-minority employees."[5]  *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citations omitted).  Once a plaintiff establishes a *prima facie* case, then the defendant may respond by offering a legitimate, non-discriminatory reason for its employment action.  *Johnson*, 215 F.3d at 573 (citation omitted). Then a plaintiff may rebut a defendant by demonstrating that the defendant's offered reason was only pretext.  *Id.* (citation omitted).

Similar to Title VII, ECLRA bars employers from taking an adverse employment action based on "discriminat[ion] against an individual with respect to employment . . . because of . . . race . . . ." Mich. Comp. Laws § 37.2202.  Under Michigan law, a plaintiff can establish a *prima facie* case of "disparate treatment" race discrimination by showing "that [he] was a member of the class entitled to protection under the act and that, for the same or similar conduct, [he] was treated differently than one who was a member of a different race." *Betty v. Brooks & Perkins*, 521 N.W.2d 518, 523 (Mich. 1994) (citations and internal quotations omitted).  Michigan also uses the burden-shifting framework of *McDonnell-Douglas* for establishing an inferential basis for racially motivated employment discrimination.  *See Snieciniski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003) (citations omitted).  Any differences between Title VII jurisprudence and ELCRA jurisprudence, as applied to this case, are negligible.  Indeed, the parties have not identified or argued any such possible difference.

---

[5] More generally, a *prima facie* case of race discrimination under Title VII requires a plaintiff to show "(1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citation omitted).

The parties seem to accept the proposition that the case involves direct evidence of race discrimination. Plaintiff does allege that his manager sometimes greeted him with remarks or gestures that could be understood to include racial overtones. Defendant does not discuss the meaning of these remarks or gestures, nor does Defendant dispute Plaintiff's contention that they carried a pejorative racial meaning. Plaintiff also alleges that that same manager made the decision to suspend him, pending dismissal. A different manager, however, issued the tardy that served as the basis for that employment action. Significantly, Plaintiff signed a release that waived all claims against Defendant that were or could have been included in his complaint of racial discrimination to the MDCR. Consequently, Plaintiff has waived all claims based on Defendant's acts prior to June 13, 2005.

Plaintiff does assert, however, that Bouvrette continued to address him in this unwanted manner up until Plaintiff's termination. With the racial overtone of Bouvrette's remarks or gestures uncontested by Defendant, Plaintiff has provided a basis for direct evidence of intentional discrimination. Indeed, the supervisor who made the adverse employment decision also made the undesired greetings.

As to an inferential case of racially motivated employment discrimination, the parties have also little addressed the elements of a *prima facie* case, based on either disparate treatment or more general discrimination. As an African-American, Plaintiff is a member of a protected class. In addition, because Defendant terminated his employment, he suffered an adverse employment decision. As to the third element, no party has contested that Plaintiff was qualified for his position, although his repeated attendance difficulties might arguably show that he undercut his own qualifications.

More importantly, the evidence regarding any different treatment for the same conduct for similarly situated non-minority employees is thin, at best. Both parties devote substantial energy to discussing the facts of the morning of December 19, 2005 and the countdown of the seconds to Plaintiff logging in to his work station. Deposition testimony of Plaintiff and others does, at times, allude to the possibility that other customer service representatives may have had a different experience when they faced difficulty logging in to their computer at the start of a shift. Neither party, however, meaningfully briefs or argues the treatment of similarly situated individuals for similar conduct. Nor has either party addressed whether Plaintiff was replaced by a person outside his protected class, if the standard for a more general employment discrimination claim applies, rather than the standard for a disparate treatment claim.

Instead, Defendant emphasizes that it had a legitimate, non-discriminatory reason for terminating Plaintiff. After reviewing its attendance policy, the tardies and incidental absences attributed to Defendant before December 19, 2005, and the precise timing of events on December 19, 2005, Defendant contends that it has a well-founded basis for deciding to suspend Plaintiff pending dismissal and, eventually, to dismiss him. Defendant's exclusive reliance on its attendance policy, however, leaves Defendant open to precisely the challenge that Plaintiff advances. That is, Plaintiff offers a competing version of the occurrences of December 19, 2005, asserting that he arrived within the three-minute grace period. Defendant does not argue that its attendance policy afforded some measure of discretion or that Plaintiff's supervisors exercised independent discretion to conclude that termination was warranted. In fact, Defendant offers no basis for Plaintiff's termination, other than that it necessarily followed from the circumstances of December 19, 2005 and the scrupulously applied terms of Defendant's attendance policy. Because Plaintiff offers

evidence that he timely logged in, a material issue of fact remains regarding whether Defendant had a legitimate, non-discriminatory basis for his termination. Plaintiff does not advance any evidence that Defendant's proffered reason was pretextual.

Accordingly, despite the limited evidence and legal argument, Defendant has not shown that it is entitled to judgment as a matter of law as to Plaintiff's claims of employment discrimination under Title VII or ELCRA, in the absence of a genuine issue of material fact.

B.

As to Plaintiff's claim of retaliation, 42 U.S.C. § 2000e-3(a) prohibits retaliation against employees who invoke rights under Title VII. The statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

*Id.* Much like a discrimination claim, courts employ the *McDonnell-Douglas* framework to review a retaliation claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). To make out a *prima facie* case, a plaintiff must show that "(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to [the] defendant; (3) [the] defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Id.* (citations omitted). The same opportunity under the *McDonnell-Douglas* framework – for a defendant to offer a legitimate, non-discriminatory reason for its employment and for a plaintiff to rebut that reason as pretextual – then follows any showing of a *prima facie* case.

Similar to Title VII, ELCRA bars an employer from "retaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws § 37.2701(a). A claim of unlawful retaliation requires a plaintiff to show "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Rymal v. Baergen*, 686 N.W.2d 241, 256 (Mich. Ct. App. 2004) (citation and internal quotation omitted). Similar to the above-discussed claims, the parties have not addressed any meaningful difference between a claim of retaliation under Title VII and under ELCRA, either as to the legal standards or as applied to these facts.

Under either legal standard, Plaintiff has provided evidence of the first three elements. That is, Plaintiff engaged in protected activity by filing claims under Title VII and ELCRA against Defendant, Defendant knew of that fact, and Defendant subsequently took an adverse employment action against Plaintiff.

As to the causal connection, however, both parties offer little evidecnce. Defendant advances the bare assertion that Plaintiff has not pointed to any causal connection between the issuance of a tardy for December 19, 2005 and his filing of claims before the MDCR. Although a jury might agree with Defendant on that point, Defendant bears the burden of supporting its own motion for summary judgment. Instead of developing its point, Defendant returns to its argument that Plaintiff failed to follow protocol for resolving a computer glitch that allegedly prevented his timely login. Defendant reiterates the existence of an allegedly legitimate, non-discriminatory basis

for its termination decision. The same genuine issue of material fact remains here, as with the general discrimination claim under Title VII and ELCRA. That is, an issue of fact remains because Plaintiff maintains that he timely logged in, which contradicts Defendant's alleged basis for terminating him under its attendance policy. Neither party seems to treat Plaintiff's challenge as one of pretext, i.e., that Defendant trumped up its termination rationale, which leads the Court to conclude that an issue of fact remains regarding the existence of a legitimate, non-discriminatory reason for the termination of Plaintiff's employment. Consequently, Defendant has failed to sustain a challenge as to the elements of a *prima facie* claim of retaliation.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #10] is **DENIED**.

It is further **ORDERED** that the hearing set for August 21, 2007 at 3:30 p.m. is **CANCELLED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 21, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 21, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS